**KUNIYUKI v. ACHESON, Secretary of State.**

**No. 2560.**

United States District Court,
W. D. Washington, N. D.

Aug. 24, 1950.

360

A. L. Wirin and Fred Okrand, Los Angeles, Cal., William Y. Mimbu, Seattle, Wash., for plaintiff.

J. Charles Dennis, U. S. Atty., John E. Belcher, Asst. U. S. Atty., Seattle, Wash., for defendant, Dean Acheson, Secretary of State.

HALL, District Judge.

The American born plaintiff seeks in this action a judgment that she is a citizen of the United States.

■ The first thing to take into consideration is the jurisdiction of the Court. I will now find that under Section 903 of Title 8 U.S.C.A., this Court has jurisdiction to hear and try this case and make a judicial determination as to whether or not the plaintiff in this case was deprived of her citizenship by voting in the elections in Japan according to the evidence in the case.

The Section involved on the merits is 401(e) of the United States Nationality Act, 801(e), Title 8, U.S.C.A., and reads as follows: "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by * * * voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory".

The first clause is the one that is involved here, that is "voting in a political election in a foreign state". It calls for a judicial determination of several words; and also some factual determination. In the first place, from the facts in the case, there isn't any doubt but what the plaintiff in the case voted, that is, she cast her ballot in two elections, at least, in Japan in the years 1946 and 1947 (although the State Department rests its position upon the claim that she has expatriated herself under the provisions of Section 401(e), by voting in the Japanese political elections of April 1946).

■■ The words which require judicial construction and determination as to their meaning, are three,—"Political election", "foreign" and "State". Taking them in the order which they are easiest to determine, I will take the word "foreign", first. There isn't any doubt but what Japan is foreign to the United States in the

sense that it is the opposite of, and is intended to have the opposite meaning of, the word "domestic", which includes the territory of the United States. So whether Japan is or was during that period of time a foreign "state" or not, it nevertheless was foreign.

The main question is whether or not it was a "State". It is the contention of the defendant, here, the Secretary of State, that Japan was a State. As to the definition of the word "State", a great many text books and writers on International Law have dealt with the word for many years; but actually its meaning has not changed much, since it was defined by Vattel in his French work published about 1773. That definition is continued on through Moore's Digest of International Law, Revere, Hackworth and others. I do not wish to ever be in the position of citing simply myself in rulings but in the case, U. S. v. Kusche, D.C., 56 F.Supp. 201, the question was raised whether or not Hitler's Third Reich was a State; that is to say, whether or not it was the same German State as that from which the person involved there had renounced his allegiance. I held that it was; but the case reviewed the elements necessary to constitute a State, and I came to the conclusion, to which I still adhere, that a State comprehends a body of people living in a territory, who are not subject to any external rule but who have the power within themselves to have any form of government which they choose and have the power to deal with other States. In other words, they have sovereignty. That is the first essential, in a State; and I think that is recognized by the cases on which the government relies, e. g.—Jones v. U. S., 137 U.S. 202 at page 212, 11 S.Ct. 80 at page 83, 34 L.Ed. 691. The Court says, "Who is the sovereign, de jure or de facto, of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive departments of any government conclusively binds the judges", and so forth. But the kernel of the definition, as included there, is sovereignty. Likewise, in the Venustiano Carranza case—Oetjen v. Central Leather Compa-

ny—, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726, the Government of the United States acting through the regularly elected officials had officially recognized,—that is to say, the President of the United States had officially recognized the Government of Carranza as the Government of Mexico, and this is certainly quite different than the situation which has obtained here.

In an effort to determine whether or not Japan has any sovereignty and the other attributes which make for the creation or existence of a State, we refer to the plaintiff's Exhibit 2, here, "Occupation of Japan", the official book put out by the State Department of the United States containing the text of the various documents which relate to Japan prior to the surrender and subsequent to the surrender. I don't think it is necessary to review the Potsdam Declaration, the Emperor's reply thereto and the acceptance thereof. But to start with, the Instrument of Surrender, itself, which is found on page 62 of this document, recites, "We"—now, that is not only the Japanese but also Douglas MacArthur who has signed as Supreme Commander for the Allied Powers.

Incidentally, I can take judicial notice of the fact that prior to this date he had been designated the Supreme Commander for the Allied Powers by the various Allied Powers to act for and on behalf of all of them in connection with the surrender and all subsequent matters. That document is not in this book. However, it is available and it is a matter of which the Court can take judicial notice. The Instrument of Surrender is signed by the Japanese Government and also by the United States Representatives, and Representatives of the Republic of China, the United Kingdom, Soviet Russia, Australia, Dominion of Canada, French Republic, the Netherlands and New Zealand.

With further reference to its text, it recites: "We hereby command all Civil, Military and Naval authorities to obey and enforce all proclamations, orders and directives deemed by the Supreme Commander for the Allied Powers to be proper to effectuate this surrender and issued by him

or under his authority and we do direct that all such officials remain at their posts and to continue to perform their non-combatant duties unless specifically relieved by him or under his authority."

And, further: "The authority of the Emperor in the Japanese Government to Rule the State shall be subject to the Supreme Commander for the Allied Powers who will take such steps as he deems proper to effectuate those terms of surrender."

Some suggestion is made, on behalf of the Secretary of State, that the Far Eastern Commission superseded and supplanted the Supreme Commander for the Allied Powers in the Government of Japan. But the original proposal was only that the Allied Commission should act as an advisory body; and that is all it finally amounted to actually, in the agreement which I think was effectuated at Moscow and promulgated December 27, 1945. The Far Eastern Commission is given power to formulate the policies, principles and standards. It has the power to review, on the request of any member, any directive issued by the Supreme Commander and the like, and the functions of the United States Government are defined and outlined. But as I indicated to counsel during the course of the argument, there is a subdivision B to that and that is the, "Allied Council for Japan"; and under that: "The Supreme Commander shall issue all orders for the implementation of the Terms of Surrender," So that the Terms of Surrender—and I am satisfied it has been so regarded by the Supreme Commander in Japan and by the United States Government in supporting the Supreme Commander for the Allied Powers in various disputes which have arisen with the Far Eastern Commission—were that he is the one who effectuates the instrument of surrender; and under the instrument of surrender the authority of the Emperor and the Japanese Government to rule shall be subject to the Supreme Commander for the Allied Powers, and not to any Far Eastern Commission. So actually, in my judgment, and I so hold, this agreement of the Foreign Ministers to establish the Far Eastern Commission did not take away the power of the Supreme Commander which, as I indicated, was complete authority over the Emperor and the Japanese Government.

Returning again to "Occupation of Japan", we find here the document of August 29, 1945. I think it was promulgated on September 6, 1945. On page 75 of "Occupation of Japan" under the subject "Allied Authority," we read: "Although every effort will be made, by consultation and by constitution of appropriate advisory bodies, to establish policies for the conduct of the occupation and the control of Japan which will satisfy"—not the Japanese Government but—"The Principal Allied powers, in the event of any differences of opinion among them, the policies of the United States will govern."

Also,

"Relationship to Japanese Government."

"The authority of the Emperor and the Japanese Government will be subject to the Supreme Commander, who will possess all powers necessary to effectuate the surrender terms, and to carry out the policies established for the conduct of the occupation and the control of Japan."

"The Japanese Government will be permitted, under his instructions, to exercise the normal powers of government in matters of Domestic Administration."

[7] Mind you, it says, that it will be permitted, under his instructions. I have no idea how many directives have been issued, but I will call attention to one or two (and that is a matter of which I can take judicial notice) that the Japanese Government is run by receiving a directive from the Supreme Commander to the Allied Powers addressed to the Japanese Government; and then followed, in turn, by some action on the part of the Japanese Government; or if the matter is initiated by the Japanese Government, it becomes a proposal. And when the proposal is approved it then becomes a directive.

But, continuing: "This policy, however, will be subject to the right and duty of the Supreme Commander to require changes in Governmental machinery or personnel or to act directly if the Emperor or other Japanese authority does not satisfac-

torily meet the requirements of the Supreme Commander in effectuating the surrender terms. This policy, moreover, does not commit the Supreme Commander to support the Emperor or any other Japanese Governmental authority in opposition to evolutionary changes looking toward the attainment of United States objectives."

And here is the key phrase: "The policy is to use the existing form of government in Japan, not to support it."

Then it goes on further, suggesting methods of change. In Part III * * * Political, (of that Directive) on page 76: "High officials of the Japanese Imperial General Headquarters, and General Staff, other high military and naval officials of the Japanese Government, leaders of ultra-Nationalists and militarist organizations and other important exponents of militarism and aggression will be taken into custody and held for future disposition."

There you are taking the people, whom the Japanese people or the Japanese Government exercising its power as a State had selected as its officials to run it, and you are wiping them out entirely. There is certainly no evidence of independent action or sovereignty there.

Furthermore it says: "Laws, decrees and regulations which establish discriminations on ground of race, nationality, creed or political opinion shall be abrogated; those which conflict with the objectives and policies outlined in this document shall be repealed, suspended or amended as required; and agencies charged specifically with their enforcement shall be abolished or appropriately modified. Persons unjustly confined by Japanese authority on political grounds shall be released. The judicial, legal and police systems shall be reformed as soon as practicable to conform to the policies set forth in Article I and III"—and so forth.

The next document is important, "Economic Demilitarization." They take away the army and navy and the air force. The Japanese were not allowed these. Furthermore, they take away the number and limit the size of ships. The Japanese were not allowed to engage in their ordinary

method of banking. Over on page 79: "To this end it shall be the policy of the Supreme Commander: (a) To prohibit the retention in or selection for places of importance in the economic field of individuals who do not direct future Japanese economic effort solely towards peaceful ends; and (b) To favor a program for the dissolution of the large industrial and banking combinations which have exercised control of a great part of Japan's trade and industry."

And pursuant to that, the banks were dissolved,—large corporations which had theretofore existed, were dissolved; their properties were taken and distributed to the Japanese people.

Continuing further on page 79: "The Japanese authorities will be expected, and if necessary directed, to maintain, develop and enforce programs that serve the following purposes"—and it sets forth some of the requirements and aims of the Occupation of Japan.

And, at Page 81:

"International Trade and Financial Relations."

"Japan shall be permitted eventually to resume normal trade relations with the rest of the world. During occupation and under suitable controls, Japan will be permitted to purchase from foreign countries raw materials and other goods that it may need for peaceful purposes, and to export goods to pay for approved imports.

"Control is to be maintained over all imports and exports of goods, and foreign exchange and financial transactions. Both the policies followed in the exercise of these controls and their actual administration shall be subject to the approval and supervision of the Supreme Commander in order to make sure that they are not contrary to the policies of the occupying authorities, and in particular that all foreign purchasing power that Japan may acquire is utilized only for essential needs."

All Japanese property abroad was taken away. Every vestige of sovereignty, as exercised by a nation or state, was taken away. The Japanese did keep their government. As indicated here, it was to be

used and not to be supported; and to be used for the purpose of carrying out the policies of the Instrument of Surrender, and of the following document which still remains the principal document of outline.

Further, on page 88: "Authority of General MacArthur as Supreme Commander for the Allied Powers."

And on page 89: "The Authority of the Emperor and the Japanese Government to rule the State is subordinate to you as Supreme Commander for the Allied powers. You will exercise your authority as you deem proper to carry out your mission. Our relations with Japan do not rest on a contractual basis, but on an unconditional surrender. Since your authority is Supreme, you will not entertain any question on the part of the Japanese as to its scope."

Here not only is a government that has no independence or has no supremacy; but they are not even allowed to question any act of the Supreme Commander for the Allied Powers.

Attention must be given in this connection to Appendix 18, page 94, of "Occupation of Japan", reporting the Japanese "Bill of Rights". You will notice there that that is a SCAP [1] directive of October 4, 1945. In other words, this was an order from the Supreme Commander of the Allied powers to the Japanese Government; and it deals with many, many subjects. But I will not take time to review them, in this oral statement from the bench as they are in front of each of you.

Another SCAP Directive, of January 4, 1946, provides for: "Removal and Exclusion of Undesirable personnel from public office."

It goes on,—well, it just practically cleans out the entire Japanese Government. I am not going to take time to review them but it starts out with war criminals, career persons, and persons influential in activity in certain political associations,—the control associations which exercised power over the various industries in Japan, and particularly with relation to their financial and ordinary, economic business life; that is to say, the private lives of the people.

Subdivision "E" of the Appendix, abolishes officers of financial and development organizations involving Japanese expansion; and gives a long list, beginning with the "South Manchurian Railway Company" and so forth and it says,

"Any other bank, development company or institution whose foremost purpose has been the financing of colonization and development activities in colonial and Japanese-occupied territory," and so forth.

And again the SCAP Directive of January 4, 1946, Appendix 21, provides for "Abolition of Certain Political Parties, Associations, Societies, and other Organizations," and gives a list of organizations to be abolished.

The "Japanese Draft Constitution," Appendix 23, appears on page 117. It is to be noted that the draft was submitted by the Japanese Government to SCAP for SCAP's approval; and subsequently the Supreme Commander for the Allied Powers did approve it, and this is the only thing which gave it life or vitality at all.

I think that I perhaps should observe that Appendix number 25 originated with the Emperor, himself—namely, The "Imperial Rescript Denying Divinity of Emperor."

Appendix 27, is another SCAP Directive. And while that says: "You are hereby authorized to hold a general election," it will be noticed that that is entitled a "Directive" from the Supreme Commander from the Allied Powers to the Japanese Government. That is on page 136.

And General MacArthur's reply to the Far Eastern Commission is certainly indicative of the extent to which he regarded his power to go. He says,—well, he indicates at page 138 where it refers to his purge directive, "90 percentum of the members of the present Diet, as well as many other persons holding high government office in the war administration, have been removed from government service and barred from public office or activity as officers of political parties."

He indicates that if the election should go wrong: "The remedy is always in my power to require the dissolution of the Diet

---

1. Abbreviation for the term "Supreme Commander for the Allied Powers."

and the holding of a new election under such provisions as are deemed necessary."

Again he says the same thing on page 140, in his answer to the Commission's question number 3; and the nature of the elections are indicated by his approval of the elections in Appendix number 30.

 I think from what I have said that it is clear that my opinion is that Japan did not exercise any sovereignty. And whatever else it may be called, in the rather mixed up international situation as it is today, it cannot be called a foreign State within the contemplation and meaning of the terms of Section 801(e) of Title 8 of the U.S.C.A.

 There is another word, I think, that needs definition and that is "Political Election." In view of the fact that the election was called at the direction of General MacArthur, that all of the candidates had to be screened, that General MacArthur had the power to dissolve the Diet, call a new election and effectuate any purge —that is to say put everybody out of public office who might have been elected—it seems to me that the election held in Japan does not come within the meaning of a political election as used in 801(e). It is more in the nature of a plebiscite.

 I think the words "Political Election", as used in 801(e) mean an election by which the people do not just exert or express their wish; but actually exercise a command that certain people shall hold certain public office. Now, actually, what the elections were in Japan were not a command by the people, which they were capable of enforcing, that certain persons should hold certain public offices; but merely, in view of the power of the Commander to negate it, they were merely the expression of a wish, or, at best, merely a plebiscite. I think probably we call them "Polls" in this country today. So I don't think that the election at which this lady voted in Japan, or the elections held were the type of elections that were contemplated by Section 801(e) or meant by that section. That disposes of that feature of the case.

Before coming to the other feature of the case, I would like to say in that connection that I think I am supported in my views here, not only by Arikawa v. Acheson, U.S.D.C.S.D.Cal., 83 F.Supp. 473; but Hatsuye Ouye v. Acheson, U.S.D.C. Hawaii, 91 F.Supp. 129; Yamamoto v. Acheson, U.S.D.C.Ariz., 93 F.Supp. 346; Brehm v. Acheson, U.S.D.C.Tex., 90 F. Supp. 662, and Fujizawa v. Acheson, U.S. D.C.C.S.D.Cal., 85 F.Supp. 674; all heretofore decided by various United States District Courts.

That disposes of the case and the plaintiff is entitled to judgment on the law. But if I should be in error in the conclusions I have just announced, there remains one other question.

 The other question is one of fact and is whether or not the act of the plaintiff in voting was a voluntary act. In the first place, I am satisfied that the statute is not meant to be and was not meant by Congress to be an arbitrary deprivation of a person's citizenship in the United States by doing an act which he did not know the meaning of at the time he did it. In other words, the act has to be knowingly done, and it has to be voluntarily done.

I don't think I would be justified, from any evidence in this case, in holding that there was any duress, that there was any physical threat of bodily harm; or physical threat of the deprivation of her liberty, her home, her job, her food or her clothing or any other of the many various means which modern civilization (and I guess ancient as well) has of hurting people physically in order to coerce them to do things. There is no question as to that at all.

The question is whether her voting was voluntary on her part. We have here a woman who was born in the United States; and when she was two or three years old, was taken to Japan where she lived all of her life except for eight months just prior to the commencement of the war in 1941. She went back to Japan; and remained there until 1950. She was a Japanese citizen. There is no doubt but what

she had dual nationality both in the United States and in Japan; and that as a Japanese citizen she was subject to the Japanese laws which regulated and ruled Japanese citizens. I recall, in reading one of the documents here in evidence that the directive either from SCAP or a publicity release was that all Japanese citizens should vote. Now, certainly, she was a Japanese citizen.

I think in her situation, with the fact that great emphasis in that election in Japan was placed upon the rather subordinate place which women had had in that country theretofore, and the fact they were now to be given an equality of rights, that she did not do a voluntary act.

I think at the time she had, as she has indicated in her testimony in this case, admiration for the conduct of the occupation of Japan by the Supreme Commander for the Allied Powers. I do not think she would have willingly or knowingly done any act at all, which might ever possibly have endangered her American citizenship.

 I don't know, perhaps I would not be justified in drawing on my own personal experience in Japan, in going there after the war; but perhaps it is a matter of which we can now take judicial notice, that is, the willingness of the Japanese people generally, and their anxiety to please the Supreme Commander for the Allied Powers and the Occupying Authorities; their great eagerness to actually learn the ways of democracy; their disappointment at having been misled for so many years in the program for world conquest; which the Military Caste in control of Japan had launched upon; and their avid appetite to learn and adopt Democratic ways and institutions. I notice, that in one of these documents in evidence here, it is rather wryly remarked that it may take some time. Of course it will. But in the meantime, certainly, I do not think that this woman should be penalized by a denial of her citizenship, on the ground that she voluntarily and freely voted in these elections, when there was so much confusion in Japan; and when, quite obviously, she did not know that she would be losing her United States citizenship. And on that point I am constrained to hold, and do hold, that the Plaintiff did not voluntarily vote in the elections in Japan, which the evidence shows she did.

The plaintiff will prepare the findings of fact and conclusions of law.