**In re INITIATIVE PETITION NO. 364, State Question No. 673.**

No. 86828.

Supreme Court of Oklahoma.

Dec. 10, 1996.

Gary W. Gardenhire, Norman, for Proponent Joe Windes, Oklahoma Term Limits.

Neal Leader, Senior Assistant Attorney General, Oklahoma City, for State of Oklahoma.

Thomas Dee Frasier, Frasier and Frasier, Gary D. Allison, Tulsa, for Protestant James C. Thomas.

SIMMS, Justice:

This is an original action brought pursuant to 34 O.S.Supp.1992 § 8 by protestant, James C. Thomas, to challenge the legal sufficiency of Initiative Petition No. 364, State Question No. 673, and an appeal by proponent, Joe R. Windes, as chairman of Oklahoma Term Limits, from the ballot title prepared by the Attorney General, pursuant to 34 O.S. § 10. We conclude that the measure is facially violative of the constitutions of Oklahoma and the United States and may not be placed on the ballot for submission to the people.

## I

### OKLAHOMA AND THE TERM LIMITS BATTLE

In 1994, Oklahoma became the first state to enact term limits for its Congressional representatives. This was achieved through an amendment to the Oklahoma Constitution by way of an initiative election. See *In re Initiative Petition No. 360*, 879 P.2d 810 (Okla.1994). In that election, the state question garnered 67 per cent of the vote. Twenty-one other states had adopted term limit measures at the time the United States Supreme Court held them unconstitutional on May 22, 1995, in *United States Term Limits v. Thornton*, —— U.S. ——, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). The Court suggested that such a fundamental change in the federal constitutional framework "must come not by legislation adopted either by Congress or by an individual state, but rather—as have other important changes in the electoral process—through the amendment procedures set forth in Article V." *Id.* at ——, 115 S.Ct. at 1871 (footnote omitted).

Congressional term limits supporters have begun a campaign to get two-thirds of the states to apply to Congress to call a federal constitutional convention on the question. One effort in that campaign is Initiative Petition No. 364.

## II

### INITIATIVE PETITION NO. 364 and PROTESTANT'S LEGAL CHALLENGE

This initiative measure declares that the people of Oklahoma desire that the Oklahoma Legislature apply to Congress for the calling of a Federal Constitutional Convention leading to the adoption of the specific proposed amendment which is set forth in full, and the voters should be kept informed of their legislators' efforts in this regard.[1]

1. The People of Oklahoma find and declare that:

   Whereas, the People of our State voted by over sixty-six percent to limit the terms of U.S. Representatives to three terms and limit U.S. Senators to two terms, and

   Whereas, the U.S. Supreme Court has ruled that an amendment to the U.S. Constitution is necessary to limit terms of members of Congress, and

   Whereas, there are two methods to propose amendments to the U.S. Constitution that must then be ratified by three-fourths of the States, or thirty-eight. These methods are (1) for two-thirds of both houses of the United States Congress to so vote, or (2) for thirty-four States to apply for an Article V convention to so vote, and

   Whereas, the Congress has refused to propose such an amendment, and by a clear majority, defeated the same term limits passed by over sixty-six percent of the Voters of our State in 1994, and

   Whereas, the Congress has a clear conflict of interest in proposing term limits on its own members.

   Therefore, We, the People of Oklahoma, hereby amend our state constitution pursuant to our power under that constitution.

   We, the People of Oklahoma, hereby state our desire that this Oklahoma constitutional amendment leads to the adoption of the United States Constitutional Amendment set forth in this amendment.

   We, the People of Oklahoma, find that the Voters of our State should be informed regarding incumbent state legislators' support for the following proposed application to Congress:

   We, the People and Legislature of the State of Oklahoma, due to our desire to establish Term Limits on the Congress of the United States, hereby make application to Congress,

The proposed application to Congress on behalf of the People and the Legislature pursuant to their power under Article V to call a convention is set forth. The measure then states the public policy of Oklahoma regarding term limits, namely "that the term of members of the United States Congress should be limited to three terms for members of the House of Representatives and two terms for members of the Senate, and the United States Constitution should be amended to so provide." [2] It then instructs "each member of the Oklahoma Legislative to use all his or her delegated powers to make application under article V of the United States Constitution to the United States Congress calling for an article V convention" to propose the federal term limits amendment it specifies.[3] The measure requires that the

   pursuant to our power under Article V, to call an Article V Convention.

2. Section 2—Public Policy of Oklahoma Regarding Federal Term Limits.

   It is hereby declared to be the Public Policy of the State of Oklahoma that the terms of office of Members of the United States Congress should be limited to three terms for members of the House of Representatives and two terms for Members of the Senate, and the United States Constitution should be amended to so provide.

3. Section 3—Instruction to the Legislature Regarding Federal Term Limits.

   In furtherance of the Public Policy stated in Section 2 of this Amendment, the People of Oklahoma hereby instruct each Member of the Oklahoma Legislature to use all of his or her delegated powers to make application under Article V of the United States Constitution to the United States Congress calling for an Article V Convention for the purpose of proposing the following Amendment to the United States Constitution: CONGRESSIONAL TERM LIMITS AMENDMENT

   Section A. No person shall serve in the office of United States Representative for more than three terms, but upon ratification of this amendment no person who has held the office of United States Representative or who then holds the office shall serve for more than two additional terms.

   Section B. No person shall serve in the office of United States Senator for more than two terms, but upon ratification of this amendment no person who has held the office of United States Senator or who then holds the office shall serve for more than one additional term.

   Section C. This amendment shall have no time limit within which it must be ratified to

clause "FAILED TO COMPLY WITH CONSTITUTIONAL INSTRUCTION ON TERM LIMITS" be printed next to the name of any member of the State Legislature appearing on any ballot following a legislative term in which the legislator failed to support the calling of a constitutional convention or failed to support the specified term

become operative upon the ratification of the legislatures of three-fourths of the several States.

4. Section 4—Information to the Voters Regarding Federal Term Limits.

In furtherance of the Public Policy stated in Section 2 of this Amendment and the Resolution of the People stated in Section 3 of this Amendment, all primary, runoff, and general election ballots shall have the notation "FAILED TO COMPLY WITH CONSTITUTIONAL INSTRUCTION ON TERM LIMITS" printed adjacent to the name of any Member of the State Legislature seeking state legislative office who, during their preceding term of office:

(a) failed to sponsor or otherwise to propose, in a timely fashion, a legislative measure that would cause to be made the application to Congress set forth in Section 3 of this Amendment, if no other legislator has so sponsored or otherwise proposed such a measure; or

(b) failed to vote in favor of any measure to make application to Congress set forth in Section 3 of this Amendment when brought to a vote in the State Legislature or any committee or subcommittee thereof; or

(c) failed to vote against any change, addition, or modification to the application set forth in Section 1 of this Amendment; or

(d) failed to vote against any attempt to delay, table, or otherwise prevent a vote of the Legislature on any measure to make the application to Congress set forth in Section 3 of this Amendment; or

(e) failed in any way to ensure that all votes of the Oklahoma legislature on the application set forth above or any amendment sent to the States for ratification are recorded and made available to the People; or

(f) failed to vote in favor of the constitutional amendment set forth in Section 3 of this Amendment, if it is sent to the States for ratification; or

(g) failed to vote against any amendment with longer term limits if such an amendment is sent to the States for ratification.

The notation provided for in this section when required by any of subsections (a) through (e) shall not appear adjacent to the names of candidates for state legislature if the State of Oklahoma has made an application to Congress for an Article V convention pursuant to the Act and such application has not been withdrawn, or if a Congressional Term Limits Amendment has been submitted to the states for ratification.

limit amendment.[4] The Secretary of the State Election Board is charged with the duty to determine whether the ballot notation shall appear on any ballot.[5] The provisions of the measure are severable.[6]

Protestant urges that the initiative measure is violative of the constitutions of the United States and the State of Oklahoma.

The notation provided for in this section when required by any of subsections (f) through (g) shall not appear adjacent to the names of candidates for state legislature if the State of Oklahoma has ratified the proposed Congressional Term Limits Amendment set forth above.

The notation provided for in this section when required by any of subsections (a) through (g) shall not appear adjacent to the names of candidates for state legislature if the proposed Congressional Term Limits Amendment set forth above has become part of the Unites States Constitution.

5. Section 5—Determination of Applicability of Notation Regarding Federal Term Limits.

It shall be the ministerial duty of the Secretary of State Election Board to ascertain whether the notation provided in Section 4 of this Amendment shall be printed on any ballot adjacent to the name of any candidate. The Secretary of the State Senate and the Chief Clerk of the State House of Representatives shall provide to the Secretary of the Election Board such records as are necessary in order to ascertain whether the notation provided in Section 4 of this Amendment shall be so printed.

Within ten days following the last day of the filing period for state legislative offices, the Secretary of the Election Board shall cause to be published in a newspaper of general circulation a list of candidates whose names on the ballot shall be accompanied by the notation provided in Section 4 of this Amendment. Within ten days following the publication of the list described in the preceding sentence, any person may file an objection with the Secretary of the State Election Board to have the notation placed on the ballot adjacent to the name of any candidate. Upon the filing of such objection, the notation shall be placed on the ballot unless the Secretary of the State Election Board finds, by clear and convincing evidence, that the candidate in question has fully compiled (sic) with this amendment.

6. Section 6—Severability.

The provisions of this Amendment are severable, and if any part or provision of this Amendment shall be void, invalid, or unconstitutional, the decision of the court so holding shall not affect or impair any of the remaining parts or provisions of this Amendment, and the remaining provisions of this Amendment shall continue in full force and effect.

His major argument regarding state constitutional grounds is that the initiative violates Art. 5, section 1 as it is not a valid exercise of the people's reserved power because: (1) it is neither a "law" nor an amendment to the state constitution, and (2) it seeks ultimately to amend the Constitution of the United States by mandating and coercing members of the Oklahoma Legislature to vote in favor of a federal constitutional convention. He also asserts that the proposal violates the multiple subject prohibition of Art. 24 sec. 1. Protestant contends that the initiative violates the Constitution of the United States in several ways: (1) it proposes to amend the Constitution by a process which does not conform to Article V, and (2) it denies Oklahoma State Legislators their right to free speech by instructing them how to vote, and (3) it denies equal protection of the laws to incumbent Legislators who will be denied equal access to impartial ballots by reason of their political expression.

We conclude that the initiative measure is constitutionally invalid and cannot be submitted to the people. We find protestant's arguments regarding issues arising under Article V of the Constitution of the United States and Art. 5, sec. 1 of the Oklahoma Constitution are persuasive and determinative of the challenge. The measure is facially violative of both provisions and must be stricken in its entirety. Accordingly, we limit our discussion to those contentions.

## III

### ISSUES ARISING UNDER ARTICLE V OF THE CONSTITUTION OF THE UNITED STATES

Article V of the federal constitution provides the process by which that document may be amended. It sets forth alternative methods of proposing constitutional amendments, by vote of Congress or on application of two-thirds of state Legislatures calling for a constitutional convention. It states:

"The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or on the application of the Legislatures of two-thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several states, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the Congress; Provided that no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article, and that no state, without its consent, shall be deprived of its equal suffrage in the Senate."

To date, all the amendments have been proposed by Congress and no effort to call a constitutional convention has been successful.

■■■■ Protestant contends that this proposal would allow the people to do indirectly what they cannot do directly—propose amendments to the Constitution of the United States. We agree. To the extent that the initiative applies for a constitutional convention or requires the Legislature to do so, it is facially violative of Article V. The law is plain that the application for a convention must come from the Legislature acting freely without restriction or limitation, not from the people through exercise of their initiative power. The legislative power in the amendment process of Article V includes only that power which has been delegated to the representative bodies of the several states, it does not include the reserved legislative power of the people.

In *Hawke v. Smith, No. 1,* 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), the United States Supreme Court held that a provision in the Ohio Constitution which would have extended the referendum to the action of the General Assembly ratifying the proposed prohibition amendment to the Constitution of the United States conflicts with Article V. Answering the question, "What did the framers of the Constitution mean in requiring ratification by 'legislatures'?", the Court determined that under Article V "[b]oth methods of ratification by Legislatures or conventions call for action by deliberative assemblages representative of the people, which it was assumed would voice the will of

the people." *Id.* at 226–27, 40 S.Ct. at 497. See also *Hawke v. Smith, No. 2,* 253 U.S. 231, 40 S.Ct. 498, 64 L.Ed. 877 (1920), concerning the same question but involving the Nineteenth Amendment extending the right of suffrage to women.

The Oklahoma Supreme Court had almost immediate occasion to follow the authority of *Hawke* in *State, ex rel. Gill v. Morris,* 79 Okl. 89, 191 P. 364 (1920) where it refused to allow the prohibition amendment to be submitted to a vote of the people after it had been ratified by the Oklahoma Legislature. The Court held that the referendum provision of the State Constitution could not be applied in the ratification process of an amendment to the United States Constitution without violating Article V of that document. Our Court upheld the position of respondent in that action, that Article V excluded the people of the several states from voting directly on amendments to the Constitution and gave that right only to the "Legislature", which word was found to refer to a representative legislative body and did not refer to or comprehend the Legislative authority of a state.

■ The people may not place limitations on the deliberative process of the Legislature. In *Leser v. Garnett,* 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922) the United States Supreme Court turned away a challenge to the validity of the ratification of the Nineteenth Amendment on the ground that Article V prohibited the limitations placed on Legislatures by their state constitutions in an effort to impair their power to ratify the Amendment. Striking the limitations, the Court stated:

> "[T]he function of a state Legislature in ratifying a proposed amendment to the federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the federal Constitution; and it transcends any limitations sought to be imposed by the people of a state." At 137, 42 S.Ct. at 217–218.

Recent similar attempts at directing state legislatures to call a federal constitutional convention have been held to violate Article V. *Amer. Fed. of Labor–Congress v. March Fong Eu,* 36 Cal.3d 687, 206 Cal.Rptr. 89, 686 P.2d 609 (1984), and *State of Montana ex rel. Harper v. Waltermire,* 213 Mont. 425, 691 P.2d 826 (1984), addressed the issue in the context of initiatives which proposed balanced budget amendments. Both decisions held that "a state may not, by initiative or otherwise, compel its legislators to apply for a constitutional convention, or to refrain from such action." *Eu,* 206 Cal.Rptr. at 102, 686 P.2d at 622; *Waltermire,* 691 P.2d at 831. Legislators must be free to deliberate and vote their own considered judgment, being responsible to their constituents through the electoral process. "A rubber stamp legislature could not fulfill its function under Article V of the Constitution." *Eu,* 206 Cal.Rptr. at 102, 686 P.2d at 622. No court has reached the conclusion that the people of a state may compel their legislators to call for a federal constitutional convention and direct them to vote for a specified amendment.

Proponents argue that the challenged initiative measure merely requests the Oklahoma Legislators to use their lawful delegated power toward a lawful end in following Article V amendment procedure. They assert that nothing in the proposal could "actually force" a legislator to make the convention call and they contend that to sustain protestant's position is to deny citizens their most basic rights of free political expression and communication with their elected representatives.

They rely on *Kimble v. Swackhamer,* 439 U.S. 1385, 99 S.Ct. 51, 58 L.Ed.2d 225 (1978), for support of their argued right to "communicate" freely with their legislators by way of initiative referendum. That case is inapposite, however. There the Legislature of the State of Nevada submitted a nonbinding advisory question to the voters of Nevada to obtain their views regarding the proposed equal rights amendment. The measure was challenged as violative of Article V but the Nevada Supreme Court in *Kimble v. Swackhamer,* 94 Nev. 600, 584 P.2d 161 (1978), found that the question did not violate Art. V. because it was purely advisory; the Legislature was able to vote for or against ratification or refrain from voting at all, without regard to the advisory vote. The Supreme Court of Nevada distinguished *Hawke* and

*Leser* because this purely advisory question was not a limitation on legislative power.

Still challenging only the issue of conflict with Article V, the protestants sought a stay from the United States Supreme Court. Justice Rehnquist, sitting as Circuit Judge, refused all requested interim relief. He did not believe a federal question was presented and found protestant's reliance on *Hawke* and *Leser* misplaced. He observed that he saw no federal constitutional "obstacle" to the Nevada Legislature submitting a non-binding advisory referendum to the people which provided by its terms that "the result of voting on this question does not place any legal requirement on the legislature or any of its members." The matter was dismissed for want of a federal question at 439 U.S. 1041, 99 S.Ct. 713, 58 L.Ed.2d 700 (1978).

Proponents of today's challenged measure argue that the Oklahoma Legislature would still have the power to disregard its direction concerning the convention call. That assertion is not correct.

This measure, if adopted, would be neither nonbinding nor purely advisory in its federal aspects. Its very words distinguish it from the measure at issue in *Kimble*. The initiative states "[t]he People ... instruct each member of the Oklahoma Legislature ... to make the specific application under Article V[to] Congress calling for an Article V Convention for the purpose of proposing the following Amendment to the United States Constitution." This is an express mandate from the people to the Legislature to take a specific action. Also, if a Legislator failed to follow the directive, his or her failure would be noted on the ballot. Under these constraints, the application made by the Legislature would violate Article V as interpreted in *Hawke* and *Leser*. Legislative deliberation cannot exist where the outcome is a predetermined specific action.

Our conclusion that these provisions of the measure which apply for a constitutional convention or seek to compel the Legislature to do so are facially violative of Article V of the United States Constitution, necessarily raises questions of severability and the validity of the remaining provisions under State constitutional challenges.

## IV

## ISSUES ARISING UNDER THE OKLAHOMA CONSTITUTION, ART. 5, § 1

■ Protestant contends that this proposed measure is beyond the power of the initiative granted the people in the Oklahoma constitution. We agree.

Article 5, § 1 of the Oklahoma Constitution reserves to the people the legislative power of the initiative and the referendum. It provides:

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."

■ The initiative process was designed to propose *laws* and *amendments* to our State Constitution and the power of the people may not be extended past those limits. The initiative measure does not propose a law. While it purports to be an amendment to the Constitution it is merely a nonbinding legislative resolution. The people have no reserved authority to propose nonbinding resolutions by the initiative process. Our constitution is not unique in this regard and we are not alone in this view.

In *State ex rel. Harper v. Waltermire,* supra, the people of that state proposed, through the initiative process, to amend the Montana Constitution to direct the 1985 legislature to adopt a resolution requesting Congress to call a constitutional convention for the purpose of adopting a balanced budget amendment. The initiative also provided that if the resolution was not adopted within 90 days after the voters passed the initiative, the Legislature would be required to remain in session without compensation until the resolution was adopted. Finding that the initiative process in the Montana Constitution was "designed to enact *laws* ", the Mon-

tana Supreme Court held that the initiative power does not include the power to enact legislative resolutions. The Court observed that while the document had the form and label of a constitutional amendment, the "subject matter reveals its true nature. It is a directive to the Legislature to take a specific action: to adopt a resolution." The Court pointed out that just labeling a document a constitutional amendment does not make it one and invalidated the citizens' attempt to create a legislative resolution by direct vote of the people. The Court stated: "A constitutional amendment facade does not enlarge the initiative power granted the people by the Montana Constitution to include the power of legislative resolution. The electorate cannot circumvent their Constitution by indirectly doing that which cannot be done directly."

In *State of Nebraska ex rel. Brant v. Beermann*, 217 Neb. 632, 350 N.W.2d 18 (1984), the Supreme Court of Nebraska rejected a proposed initiative petition seeking to express the views of the populace on a nuclear freeze and forwarding that statement of position to those in power in the United States and the Soviet Union, finding it was merely a nonbinding expression of public opinion which was not a proper subject for the initiative. Nebraska's Constitution, like Oklahoma's, gives the people the power to enact "laws". The *Beermann* court reviewed with approval a discussion by the Supreme Judicial Court of Massachusetts in *Opinion of the Justices Relative to the Eighteenth Amendment*, 262 Mass. 603, 160 N.E. 439 (1928) considering a similar question where that court was asked whether a "proposed law" introduced by an initiative petition was really a "law" within the meaning of the initiative provisions of the constitution. Holding it was not a law, but only a nonbinding expression of public opinion, the Massachusetts court set forth the following which is relevant to our situation:

"Without undertaking to frame a definition of 'law' as used in this amendment sufficiently accurate and comprehensive to meet all the conditions of the future, reference may be made to two definitions given in other jurisdictions in discussing the force and effect of statutes. In *American*

*Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356, 29 S.Ct. 511, 512 (53 L.Ed. 826, 16 Ann. Cas. 1047), it was said by Mr. Justice Holmes:

'Law is a statement of the circumstances in which the public force will be brought to bear upon men through the courts.'

In *In re Opinion of the Justices*, 66 N.H. 629, 632, 33 A. 1076, 1078, (1891) appears this pertinent discussion:

'Law' is a rule; not a transient sudden order from a superior to or concerning a particular person; but something permanent, uniform, and universal. * * * The word 'law' imports a general rule of conduct with appropriate means for its enforcement declared by some authority possessing sovereign power over the subject; it implies command and not entreaty; it is something different in kind from an ineffectual expression on opinion possessing no sanction to compel observance of the views announced. The text of the proposed law accompanying this initiative petition does not prescribe a general rule of conduct. It merely invites a declaration of opinion by voters on a subject over which the people of the commonwealth possess no part of the sovereign power. Amendment of the Constitution of the United States and repeal of amendments thereof constitute federal functions derived in every particular entirely from the Constitution of the United States. That instrument transcends all provisions sought to be enacted by the people or by the legislative authority of any state. The voters of the several states are excluded by the terms of article 5 of the Constitution of the United States from participation in the process of its amendment. By that article all power over the subject is vested exclusively in the Legislatures of the several states. *Hawke v. Smith (No. 1)* 253 U.S. 221, 227, 40 S.Ct. 495, 497, 64 L.Ed. 871, 10 A.L.R. 1504; *Leser v. Garnett*, 258 U.S. 130, 137, 42 S.Ct. 217, 217–18, 66 L.Ed. 505. The result of the vote as proposed in this initiative petition would be lacking in any effective force. The proposed law is wanting in features essential to constitute its provi-

sions a law within any permissible conception of the meaning of that word. Superficial appearances cannot clothe with the attributes of law something in substance vain and inoperative. The mandate to the secretary of the commonwealth in section 2 to tabulate the returns of the votes and to 'transmit copies * * * to each Senator and Representative in Congress from this commonwealth' is subsidiary and incidental to the main purpose of the proposed law; it relates to a matter which standing alone possesses no legal force; it cannot convert into a law something in itself ineffectual." *Opinion of the Justices Relative to the Eighteenth Amendment,* 262 Mass. 603, 160 N.E. 439, 440 (1928).

In *Paisner, et al. v. Attorney General, et al.,* 390 Mass. 593, 458 N.E.2d 734 (1983), the Supreme Judicial Court of Massachusetts, relying on *Opinion of the Justices,* supra, held that an initiative which would be no more than a nonbinding expression of opinion is not a law and is not an appropriate subject for the popular initiative.

In *Amer. Fed. of Labor–Congress v. March Fong Eu,* supra, an initiative was held to be invalid as a whole because it failed to adopt a "statute" and thus did not fall within the reserved initiative power set out in the California Constitution. The proposed initiative mandated the California Legislature to apply to Congress for a constitutional convention for the purpose of adopting a balanced budget amendment. The California Supreme Court observed that the reserved powers of initiative and referendum do not encompass all possible actions of a legislative body. Those powers are limited, under their State constitution, to the adoption or rejection of "statutes".

■ Recognizing that the right of initiative is precious to the people and is one which the courts are zealous to protect and preserve, our cases have liberally construed the constitutionally reserved power of the people to enact "laws" through the initiative process. *Oliver v. City of Tulsa,* 654 P.2d 607 (Okl.1982). But even the most liberal interpretation will not include mere resolutions or expressions of popular opinion. Laws are the creation of, and subject to,

formal statutory procedures and constraints. They must be introduced, passed and enacted according to our existing laws and they must be enforceable. A resolution is just a collective expression of opinion and desire. Explaining that difference in *Hawks v. Bland,* 156 Okl. 48, 9 P.2d 720 (1932), the Court noted that a bill and a resolution of the legislature "are entirely different in their creation, nature and purpose ... A resolution is not a law but merely the form in which the legislative body expresses an opinion ... [it] is ordinarily passed without the forms and delays which are generally required by constitutions ... prerequisites to the enactment of valid laws." *Id.* 9 P.2d at 721. In *Eu,* the California Supreme Court observed that "a resolution, as distinct from a statute, is essentially an enactment which only declares a public purpose and does not establish means to accomplish that purpose." *Id.* 206 Cal.Rptr. at 106 n. 23, 686 P.2d at 626 n. 23.

If enacted, the initiative could not be incorporated into our constitution as it is not law; it is not binding, it is incapable of being carried into effect, and it is incapable of being enforced.

■ There are two additional issues regarding the measure's invalidity on state constitutional grounds. First, the subject matter of the initiative is such that, at best, the initiative would create a transient amendment for a specialized purpose: mandating the legislature to apply to Congress for a constitutional convention for the adoption of the proposed term limits amendment. A temporary initiative measure is not a "part of the permanent fundamental law of a state" and should not be submitted under the guise of a constitutional amendment. *State ex rel. Harper v. Waltermire,* 213 Mont. at 428–29, 691 P.2d at 828.

Four years ago, this Court held that the people's legislative power as defined in article 5, section 1, of the Oklahoma Constitution does not include the power to use the initiative process to attempt to change federal constitutional law. *In re Petition No. 349, State Question No. 642,* 838 P.2d 1 (Okla. 1992).

Initiative Petition No. 349 proposed to amend Oklahoma's Constitution to ban most abortions. The measure was intended as a means of setting up a test case to see if the United States Supreme Court would overturn its abortion rights decisions. After noting that "[t]he goal clearly implicit in [the] 'test case' strategy is a change in federal constitutional law," this Court held that the "initiative process guaranteed to our citizens was never intended to be a vehicle for amending the United States Constitution— nor can it serve that function in our system of government." At 11.

The present initiative measure explicitly states the "desire that this Oklahoma constitutional amendment leads to the adoption of the United States Constitutional Amendment set forth in this amendment." That desire is to be fulfilled by amending the Oklahoma Constitution in an attempt to force Oklahoma legislators to apply to Congress for a federal constitutional convention and the ratification of a specific congressional term limits amendment. Like the abortion initiative, this initiative measure is designed to trigger a process for changing federal constitutional law.

Proponents argue that this initiative measure is distinguishable from the abortion initiative because there is no United States Supreme Court case "diametrically opposed" to it. Thus, they argue, the holding concerning the abortion initiative is limited to "test case" circumstances. Proponents' reading of that case is much too narrow. The holding applies to any attempt to use Oklahoma's initiative process to amend the United States Constitution and the initiative provisions are therefore invalid under article 5, sec. 1 of the Oklahoma Constitution to the extent they also attempt to effect an amendment to the United States Constitution.

■ It is a fundamental principle that a constitution can only be revised or amended in the manner prescribed by the instrument itself, and that any attempt to revise a constitution in a manner other than the one provided in the instrument is almost invariably treated as extra-constitutional and revolutionary. *In re Initiative Petition on Proposed Charter*, 89 Okla. 134, 214 P. 186 (1923). "While it is universally conceded that

the people are sovereign and that they have power to adopt a constitution and to change their own work at will, they must, in doing so, act in an orderly manner and according to the settled principles of constitutional law. And where the people, in adopting a constitution, have prescribed the method by which the people may alter or amend it, an attempt to change the fundamental law in violation of the self-imposed restrictions, is unconstitutional." 214 P. at 188.

In *Associated Industries of Oklahoma v. Oklahoma Tax Commission*, 176 Okla. 120, 55 P.2d 79, (1936), the Court explained that the limitations on the power of the people to amend their constitution must be carefully guarded and enforced. The Court stated:

"It must be remembered that the people solemnly adopted a Constitution containing certain restrictions not only against its delegated officers and its established departments but also upon the people themselves, to the end that the Constitution should be perpetually maintained and upheld. Subject to the limitations imposed by the Federal Constitution, the reserved power of the people of the state to amend their Constitution is unlimited. But this power must be exercised in substantial conformity to the provision of the Constitution itself. Courts can approve only those acts of the people which are in substantial conformity with the procedure provided by or under authority of the Constitution."

■ Proponent, Joe Windes, through his attorney, filed an application on November 13, 1996, to allow proponent Windes to withdraw the 204,901 signatures to this initiative petition, and have this Court dismiss these proceedings as moot. He states he wishes to advance a different but undisclosed constitutional procedure. No legal authority is cited in the application which would permit a proponent to withdraw signatures from an initiative petition after the petition has been submitted to a court for determination of the legality of the petition, nor has this Court found any such authority. The right to sign an initiative petition is a personal privilege, and the right to withdraw a signature from a petition can be exercised only by the person

directly concerned. *State, ex rel., Hindley v. Superior Court,* 70 Wash. 352, 126 P. 920, 923 (1912). *In re Initiative Petition No. 2, City of Chandler,* 170 Okla. 507, 41 P.2d 101 (1935), and cases therein cited, hold that one who has signed an initiative petition may withdraw his signature after the petition has been filed only so long as action has not been taken to determine the sufficiency of the signatures.

The sufficiency of the number of signatures upon the petition in this case was made long ago. Furthermore, the legal issues arising from this initiative petition case fall within the rubric of public law questions, and one party or proponent may not unilaterally invalidate the signatures to the petition and attempt to moot the issues. Therefore, this belated application to withdraw the signatures from the initiative petition is DENIED.

The term limits initiative is invalid as a whole because it is beyond the reserved initiative power of the people set out in article 5, sec. 1 of the Oklahoma Constitution. It may not be submitted to the people.

Our decision today to invalidate Initiative Petition No. 364, State Question No. 673 is based upon separate, adequate, and independent State law grounds. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, (1983).

KAUGER, V.C.J., and LAVENDER, SIMMS, OPALA (concurs specially) and WATT, JJ., concur.

SUMMERS, J., concurs in part, dissents in part.

ALMA WILSON, C.J., and HODGES and HARGRAVE, JJ., dissent.

OPALA, Justice, concurring.

Today the court *condemns* as unfit for submission to the electorate the initiative measure here under consideration, which calls for a vote on whether the Oklahoma

Legislature should be *"instructed"* to (a) *apply* that the U.S. Congress call a national constitutional convention for the purpose of (b) *submitting to the States* a proposed amendment to the U.S. Constitution whose provisions would impose congressional office term limits. The court's sentence of nullity rests not on federal law but on the measure's unfitness for submission under the standards that govern the State's initiative process. Because I accede to the court's view that the use of Oklahoma's initiative process *must be confined to those measures which on their adoption by the people become binding as this State's law,* I concur in today's pronouncement.

The *entire initiative* before us—i.e., the declaration of state public policy that (a) congressional office terms be limited and (b) a national constitutional convention be sought in furtherance of this policy aim—*is nothing more or less than a demand for a plebiscite.*[1] It *utterly fails to satisfy the state constitution's standards for a true initiative.* Even if it were adopted, the measure could *never* become *recognized, perceived or applied* as part of this State's corpus of law. Measures that would be ineffective as state law may not be proposed by the State's initiative process. To allow this measure's submission would (a) be nothing more than a charade lulling the electorate into a *false belief* that *their will on this issue* could be translated into *effective political action,* and (b) contribute to increased disillusionment and further growth of popular cynicism about *unresponsive* government and its *devious* legal process.

Today's pronouncement does not clip the people's political wings, leaving them *sans* hope for achieving the desired change. What the court holds is that the proponents' recourse is not through the *state initiative process,* but by *political action*—i.e., through lobbying state and federal lawmakers and through the ballot box—by voting out of

---

1. *Plebiscite* is a general term for *any* test of the people's *sentiment, preference, choice or will upon any issue.* For the use of this term in a broad context see *Kuniyuki v. Acheson,* 94 F.Supp. 358, 365 (W.D.Wash.1950); *Yute Air Alaska, Inc. v. McAlpine,* 698 P.2d 1173, 1187 (Alaska 1985) (Moore, J., dissenting). A plebiscite is distin-

guishable from an initiative or referendum. *The latter has a much narrower meaning.* For an in-depth discussion of various forms of *plebiscite,* see generally Julian N. Eule, Judicial Review of Direct Democracy, 99 Yale L.J. 1503 (1990); Eule, Checking California's Plebiscite, 17 Hastings Const.L.Q. 151 (1990).

office those officials who fail to take appropriate action on the issue. The proponents' freedom of *political action* remains *utterly unimpaired* by today's opinion.

## I

## THE PROVISIONS OF ARTICLE 5 OF THE U.S. CONSTITUTION AND THEIR MEANING UNDER EXTANT U.S. SUPREME COURT JURISPRUDENCE

The proponents' obvious objective is to initiate the process that would bring about a national constitutional convention for the purpose of submitting to the states an amendment to the federal constitution whose provisions would impose congressional office term limits. By the initiative in contest *state legislators* are *instructed* to advance the proponents' cause by an application calling upon the Congress to convene a national constitutional convention. Should a state lawmaker fail to do as instructed, the words "FAILED TO COMPLY WITH CONSTITUTIONAL INSTRUCTION ON TERM LIMITS" shall be placed next to his name on ballots to be used in future elections.

Article 5, U.S. Const., provides that constitutional amendments may be proposed only by the vote of two thirds of both Houses of Congress or by application of the legislatures of two thirds of the states.[2] This process secures "deliberation and consideration before any change can be proposed."[3] Recent federal constitutional jurisprudence, *U.S. Term Limits, Inc. v. Thornton*,[4] declares that the legislatures of *the United States and of the fifty states* (and territories) are themselves powerless to place a *limit on the term of office* held (or to be held) by members of the Congress. The only legally effective method for imposing a limit on the terms of a congressional officeholder is through the Art. 5 amendment procedures. Early federal constitutional jurisprudence teaches that the electorate's reserved power of the state initiative and referendum cannot be extended to the process of ratifying federal constitutional amendments. By its pronouncement in *Hawke v. Smith*[5] the Court holds that *a state constitutional provision*, which *allows* or *requires* the referendum process to be used for the ratification of amendments proposed to the U.S. Constitution, stands in conflict with Art. 5, U.S. Const. Because the power to ratify an amendment is derived from the U.S. Constitution, neither courts nor legislative bodies (state or federal) may alter the textually prescribed process. Two years later in *Leser v. Garnett*[6] the Court, once again, condemned as unconstitutional any measure which attempts to place in the hands of the state electorate the power to ratify amendments proposed to the U.S. Constitution. *Leser* pronounces that the act of a state legislature in ratifying a proposed amendment to the U.S. Constitution is an exercise of a purely *federal function*. The procedural regime of the federal constitution trumps any barriers sought to be erected by the electorate of a state.

A recent Arkansas initiative on *congressional office term limits* expresses a goal similar to that pressed for by the document

**2.** The terms of Art. 5, U.S. Const., are:

"The *Congress*, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, *on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments*, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate." (Emphasis added.)

*See* Elai Katz, *On Amending Constitutions: The Legality and Legitimacy of Constitutional Entrenchment*, 29 Columbia J.Law & Soc.Probs. 251 (1996).

**3.** *Hawke v. Smith*, 253 U.S. 221, 226–227, 40 S.Ct. 495, 497, 64 L.Ed. 871 (1920).

**4.** *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

**5.** *Hawke, supra* note 3, 253 U.S. at 226–227, 40 S.Ct. at 496–497.

**6.** 258 U.S. 130, 137, 42 S.Ct. 217, 218, 66 L.Ed. 505 (1922).

before us today.[7] The measure instructs Arkansas' state legislators and congressional delegates to use all the powers of their respective offices to propose and secure a U.S. constitutional amendment that would limit congressional office terms. The Arkansas Supreme Court, in *Donovan v. Priest*,[8] held the measure offensive to the amendatory process of Art. 5, U.S. Const., *and* hence clearly contrary to the state's initiative process. The U.S. Supreme Court stayed on November 2, 1996 the effect of the Arkansas court's pronouncement during the pendency of certiorari proceedings.[9]

Unlike the Arkansas court, which based its opinion on federal law, this court declares today that the measure is unfit for submission under the adequate and independent standards of Oklahoma's initiative process.[10]

That fundamental-law regime is limited to facilitating effective changes in the *state constitution* or in the body of *state statutory* law. The measure in contest goes clearly beyond these parameters.

## II

## SUBMISSION OF THE PROPOSED MEASURE WOULD PUT OKLAHOMA AT RISK OF DISAPPROVING ACTION BY THE U.S. CONGRESS ACTING IN THE EXERCISE OF ITS ENFORCEMENT POWERS UNDER THE GUARANTEE CLAUSE OF THE U.S. CONSTITUTION [11]

The U.S. Constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Govern-

7. *Donovan v. Priest*, 326 Ark. 353, 931 S.W.2d 119, 126 (1996). Other states also have considered the issue whether the electorate could *dictate* to the state legislature that it make an application to Congress for a national constitutional convention. In *State ex rel. Harper v. Waltermire*, 213 Mont. 425, 691 P.2d 826 (1984), the proposed measure directed the Montana legislature to apply to Congress for a national convention in order to propose a balanced-budget amendment to the U.S. Constitution. If the legislature failed to do so within 90 days, the measure provided, the state lawmaking body would have to remain in session, with only three days of permissible recess and without pay, until the application was made. Relying on *Hawke, supra* note 3 and *Leser, supra* note 6, the Montana court held that the word "legislatures" in both the ratification and application clauses of Art. 5, referred to the legislative bodies of the states. The court concluded that "[l]egislative deliberation cannot exist where the outcome is a predetermined specific action.... The people through initiative cannot [coercively] affect the deliberative process." *Id.* at 830–831. In *AFL–CIO v. March Fong Eu*, 36 Cal.3d 687, 206 Cal. Rptr. 89, 99–102, 686 P.2d 609, 620–622 (1984), the court rejected as unconstitutional a measure that would have compelled the California legislature, on penalty of loss of salary, to apply to Congress for a constitutional convention that would propose a balanced-budget amendment. The court declared that the framers intended the amending process to reside in a body with the power to deliberate upon a proposed amendment. The highest court of Maine struck down as contrary to the Art. 5 amendatory process a state initiative similar to that proposed in *Donovan, supra*. Its opinion states that neither the state's electors nor her legislature may, without offending "the essence of federalism," control the action of the members of U.S. Congress in the performance of their duties. *Opinion of the Justices*, 673 A.2d 693, 696 (Maine 1996).

8. *Donovan, supra* note 7 at 126.

9. *Priest v. Donovan*, —— U.S.——, 117 S.Ct. 380, 136 L.Ed.2d 298 (1996), *certiorari denied*, —— U.S. ——, 117 S.Ct. 1081, —— L.Ed.2d —— (1997); *Arkansas Term Limits v. Donovan*, —— U.S.——, 117 S.Ct. 380, 136 L.Ed.2d 298 (1996), *certiorari denied*, —— U.S. ——, 117 S.Ct. 1081, —— L.Ed.2d —— (1997).

10. The U.S. Supreme Court's denial of stay request in two state-court cases in which a balanced-federal-budget initiative was refused submission to a vote, rests on "independent state-law grounds." *Montanans For A Balanced Federal Budget Committee v. Harper*, 469 U.S. 1301, 105 S.Ct. 13, 83 L.Ed.2d 1 (1984) (Rehnquist, J.); *Uhler v. AFL–CIO*, 468 U.S. 1310, 105 S.Ct. 5, 82 L.Ed.2d 896 (1984) (Rehnquist, J.). In *Uhler*, Justice Rehnquist notes that the Court "will not review state-court decisions [based on adequate and independent state grounds] ..., largely for the reason that decisions on the federal questions in such cases would amount to no more than advisory opinions. See *Michigan v. Long*, 463 U.S. 1032, 1037–1039, 103 S.Ct. 3469, 3474–3476, 77 L.Ed.2d 1201 (1983); *Herb v. Pitcairn*, 324 U.S. 117, 125–126, 65 S.Ct. 459, 462–463, 89 L.Ed. 789 (1945)." *Id.*

11. The terms of Art. 4, § 4, U.S. Const., are: "The United States shall guarantee to every State in this Union a *Republican Form of Government*, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." (Emphasis added.)

ment."[12] *The Guarantee Clause is a major constitutional norm which the U.S. Supreme Court has held to be judicially unenforceable.*[13] Our own jurisprudence recognizes the Guarantee Clause's nonjusticiability.[14] Although the clause is *nonjusticiable,* it is nonetheless *enforceable* by action of the U.S. Congress exercising its power to deny *an offending state's congressional delegation its seat in the federal lawmaking assembly.*[15]

The proposed measure calls for *"instructing"* the members of the state legislature to use "all of their delegated powers" to apply to the Congress for a national constitutional convention for the purpose of proposing a congressional office term limit amendment. The measure's *critical* statement for the support of these limits, which one of the dissents would have this court declare fit for submission, is clearly subject to condemnation as calling for an impermissible plebiscite. That offending section's text is:

> Section 2—Public Policy of Oklahoma Regarding Federal Term Limits.

> It is hereby declared to be the Public Policy of the State of Oklahoma that the terms of office of Members of the United States Congress should be limited to three terms for members of the House of Representatives and two terms for Members of the Senate, and the United States Constitution should be amended to so provide.

The only *legitimate lawmakers* for our State are (1) the legislators sitting in both houses of her assembly and (2) the people who invoke their fundamental-law power of initiative and referendum *to affect state law.* The proposed measure *goes beyond the parameters of state constitutional initiative and referendum.* It is an attempt to force a plebiscite upon the proponents' *federal-law* objective. This court cannot place its imprimatur upon the use of the state initiative either for public opinion polls[16] or for a pure plebiscite. A contrary action—one that would approve submission of the measure in context—would recast this State's political system into a form vulnerable to attack for offending basic republicanism. It would put this State *at risk* of (a) *losing* congressional accreditation for Oklahoma's elected delegation to the Congress and (b) *descending* to a clouded status as a co-equal participant in this Nation's Union of sister states.

In sum, even if approved, the initiative in contest could *not transform popular will into any form of effective, enforceable* or *binding* law. Regardless of whether this measure calls for a change in the body of state or federal law, it is unfit for submission because its text cannot become state law. State lawmakers, like their federal counterparts, cannot be compelled to cast a vote in obedience to an electorate's instructions.[17] Moreover,

12. Art. 4, § 4, U.S. Const., *supra* note 11.

13. In *Luther v. Borden,* 48 U.S. (7 How.) 1, 41, 12 L.Ed. 581, 599 (1849), the Court first announced the principle that federal courts will not enforce guarantee-clause claims. The Court refused to decide which of two factions in a Rhode Island political upheaval formed the legitimate state government, holding that the Guarantee Clause treats the issue of a state government's legitimacy as a *political question* entrusted to Congress. Congress *affirms* a state's republican form of government by admitting her senators and representatives "into the councils of the Union." *See also Colegrove v. Green,* 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946). For an in-depth discussion of the Guarantee Clause, see *Pacific States Tel. and Tel. Co. v. Oregon,* 223 U.S. 118, 133, 32 S.Ct. 224, 228, 56 L.Ed. 377 (1912); *In re Initiative Petition No. 348,* Okl., 820 P.2d 772, 781 (1991) (Opala, C.J., concurring in result). *See* in this connection Heaton, *The Guarantee Clause: A Role For The Courts,* 16 Cumberland L.Rev. 477, 478 (1986). The Guarantee Clause was first invoked in response to a series of rebellions waged against state and national

authority between 1793 and 1843, when several brief episodes of violence flared up, culminating in the 1842 Dorr Rebellion in Rhode Island. Wiecek, The Guarantee Clause of the U.S. Constitution 78–85 (Cornell University Press 1972).

14. *Brown v. State Election Board,* Okl., 369 P.2d 140, 149 (1962), citing *Colegrove, supra* note 13.

15. *See Luther, supra* note 13, 48 U.S. at 41, 12 L.Ed. at 599; *Colegrove, supra* note 13, 328 U.S. at 556, 66 S.Ct. at 1201.

16. *Donovan, supra* note 7 at 126; *Eu, supra* note 7 at 613.

17. *Thornton, supra* note 4; *Kimble v. Swackhamer,* 439 U.S. 1385, 1387, 99 S.Ct. 51, 53–54, 58 L.Ed.2d 225 (1978); *Hawke, supra* note 3, 253 U.S. at 226–227, 40 S.Ct. at 496–497. *See also State ex rel. Gill v. Morris,* 79 Okl. 89, 191 P. 364, 365 (1920); *Eu, supra* note 7 at 620–622; *Waltermire, supra* note 7 at 828.

Oklahoma's fundamental law does not permit invocation of the *state* initiative and referendum process for a change in the U.S. Constitution or in the body of federal law.[18]

# III

## THE ENTIRE MEASURE PLAINLY OFFENDS ART. 5, §§ 1–3, OKL. CONST., WHICH RESERVE TO THE PEOPLE THE POWER TO MAKE OR REJECT STATE LAW, BUT NOT A BLANKET LICENSE TO FORCE ANY FORM OF *PLEBISCITE*

### A.

### *The Use Of Art. 5, § 1 Initiative Process Is Restricted To Passing State Laws*

Not only is the proposed measure likely to be viewed as offending orthodox notions of republicanism but, more importantly, as contravening the plain text of Art. 5, §§ 1–3 [19] of the Oklahoma Constitution.

Article 5 of Oklahoma's fundamental law reserves in the people the right of the initiative (popular law-making) and of the referendum (the enacted law's popular disapproval). Under the *initiative rubric* of Art. 5, § 1 only two types of measures can qualify: (a) those that propose changes in *state statutory* law and (b) those that propose amendments to the *State's constitution.* Both must be capable of taking effect as law.[20] A referendum petition, on the other hand, is designed to call an election for the purpose of preventing a legislatively passed enactment from becoming a *law.*[21] Both the initiative and referendum measures must deal with law. The State's constitution clearly so mandates by providing that any measure referred to the people by the initiative or referendum, when approved by the electorate, have the "force" and "effect" of law.[22] *Enforceability* [23] is indeed a critical attribute for qualifying a measure under the State's constitutional initiative. *Unenforceable* law is the very antonym of an *initiative-authorized* legal product. Proposing for adoption (through the initiative process) *a measure that is facially incapable of application as a state law* is as much an oxymoron as *"gentle cruelty"* or *"deft clumsiness."*

*Oklahoma legislators, acting on any matter validly before them, cannot be reduced to puppets by the use of coercive initiative measures that restrict the independence of the lawmakers' deliberative decision-making*

---

**18.** Art. 5, § 1, Okl. Const., *infra* note 19; *Gill, supra* note 17 at 365.

**19.** The terms of Art. 5, § 1, Okl. Const., are:

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the *power to propose laws and amendments to the Constitution* and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." (Emphasis added.)

The terms of Art. 5, § 2, Okl. Const., are:

"The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the *right to propose any legislative measure,* and fifteen per centum of the legal voters shall have the *right to propose amendments to the Constitution* by petition, and every such petition shall include the full text of the measure so proposed. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety), either by petition signed by five per centum of the legal voters or by the Legislature as other bills are enacted.* * *" (Emphasis added.)

The terms of Art 5, § 3, Okl. Const., are:

"* * * Any measure referred to the people by the initiative or referendum shall take effect and be in force when it shall have been approved by a majority of the votes cast thereon and not otherwise.

\*       \*       \*

... The Legislature shall make suitable provisions for carrying into effect the provisions of this article." (Emphasis added.)

**20.** Art. 5, § 1, Okl. Const., *supra* note 19.

**21.** *See* Art. 5, § 1, Okl. Const., *supra* note 19.

**22.** Art. 5, § 3, Okl. Const., *supra* note 19.

**23.** "Enforceability" does not mean that a legal norm may never be denied compulsory status. What it does mean is that, to qualify as legal, the norm must be tested when considered invocable for application as law. In this sense enforceability is nothing more than fitness for application as law by a judicial organ in some definite procedure. Hermann Kantorowicz, THE DEFINITION OF LAW at 79 (Cambridge University Press 1958).

*process.*[24] The popular initiative of Oklahoma's government charter is a conduit for *enacting state law, not a vehicle for testing the electorate's taste (or will) for visiting political intimidation upon state or federal legislators.*

The court's approval of the measure proposed by the initiative in contest would plainly *enlarge* the powers reserved to the people in Art. 5, § 1, Okl. Const. It would make those powers co-extensive with a blanket license for calling a plebiscite on any desired expression of popular preference.[25] A judicial construction that creates in the electorate the power to invoke a plebiscite would transform Oklahoma's government from its constitutionally required republican form into a direct, Athenian-like democracy.[26] In short, this State's constitutional initiative regime cannot be extended to serve as the functional equivalent of plebiscite process for conducting any form of public opinion polls.

**B.**

### The So-called Public Policy as Law

According to the proponents, the proposed measure is a *law* within the meaning of Art. 5, § 1, Okl. Const.[27] They reason that (a) *every statute is a law* and a *statute declaring public policy* must, by settled practice, be treated as law, and (b) if statutory law may embody public policy, it follows that the re-

served power of initiative implies popular authority to declare the public policy of this State. Proponents point to the terms of 25 O.S.1991 § 302[28] as a statutory example that embodies this State's notion of legislatively declared public policy. *I view this argument as utterly lacking in jurisprudential support.*

Oklahoma's public policy is *derived from* the *established law* of the State to be *found in* her constitution, statutes and judicial decisions.[29] Section 302, enacted as a part of the Oklahoma Open Meeting Act,[30] is designed *as an interpretive device for giving the act its legislatively intended meaning.* The cited statute is clearly distinguishable from the terms of *this measure's declaration of public policy.* The latter provides that (a) federal senate and house office terms should be limited and (b) state legislators be "instructed" to apply to the U.S. Congress to call a national constitutional convention as a vehicle for achieving the popularly desired goal. Because the initiative's statement of public policy *stands by itself, detached as it is from any viable legal norm that is to be enacted,* the measure can have no effect as law.

**C.**

### The Proposed Measure Is Not Capable of Being Transformed into Law by Plebiscite

It is far more difficult to *define law*—a

---

**24.** In *Donovan, supra* note 7 at 127–128, the court notes that although the initiative measure there under consideration did not threaten state lawmakers with loss of salary, it was "nonetheless binding on the legislators in an extortive manner as failure to heed the amendment's instruction will result in threatened potential political deaths."

**25.** For the definition of *plebiscite, see supra* note 1.

**26.** An Athenian-like democracy is one that rests on the principle that all law- and other decision-making power is vested *directly* in the people who act through an assembly of citizens. *See* The Emptiness of Majority Rule, 1 Mich.J.Race & L. 195 (1996); Wright & Miller, Federal Practice and Procedure § 5663 (1992).

**27.** For the terms of Art. 5, § 1, Okl. Const., see *supra* note 19.

**28.** The terms of 25 O.S.1991 § 302 are:

It is the public policy of the State of Oklahoma to encourage and facilitate an informed citizenry's understanding of the governmental processes and governmental problems.

**29.** *Tate v. Browning–Ferris Inc.,* Okl., 833 P.2d 1218, 1225 (1992); *Tom Dolan Heating Co. v. Public Service Co.,* Okl., 480 P.2d 270, 271 (1971); *Board of County Com'rs of Tulsa County v. Mullins,* 202 Okl. 628, 217 P.2d 835, 841 (1950); *Cameron & Henderson, Inc. v. Franks,* 199 Okl. 143, 184 P.2d 965, 967 (syl.7) (1947). *See also Batchelor v. American Health Insurance Co.,* 234 S.C. 103, 107 S.E.2d 36, 38 (1959). In *Batchelor* the court notes that public policy is not susceptible of exact definition, but for purposes of juridical application, *a state has no public policy, cognizable by the courts, which is not derived or derivable by clear implication from the established law of the state.*

**30.** 25 O.S.1991 §§ 301–314.

well-nigh impossible task[31]—than it is to *identify nonlaw.* The highest court of this Nation viewed to be facially ineffective as law a resolution *passed by only one House of the Congress.*[32] Also brought within the broad category of nonlaw was a state statute that went unenforced for nearly all of its existence.[33] These are but two telling examples of how the highest Court of this Nation has dealt with norms of conduct that are either *facially unfit for application as law* or fail to pass muster as law on a closer examination of their origin or of their post-enactment treatment by officials who are charged with enforcement.[34]

The court's task here *is not to define law* as an abstract concept but *to test* whether *this* measure, if adopted, could *attain* the quality of law.[35] The proposed measure in

**31.** There is no "air tight" definition of "law". Legal philosophers concede that an all-inclusive definition of law is impossible to craft.

> A definition both excludes and includes. It marks out a field. It makes some matters fall inside the field; it makes some fall outside. And the exclusion is almost always rather arbitrary. I have no desire to exclude anything from matters legal. In one aspect law is as broad as life, and for some purposes one will have to follow life pretty far to get the bearings of the legal matters one is examining. Karl Llewellyn, JURISPRUDENCE 4 (1962).

**32.** *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In *Chadha,* the Court held unconstitutional the assumed power of either House of Congress, acting alone, to overrule by resolution the Attorney General's discretionary suspension of deportation for reasons of "extreme hardship". The one-House congressional veto provision, the Court held, violates the explicit constitutional requirement for bicameral passage and presentment of the bill to the President before it becomes law. *Id.,* 462 U.S. at 946–948, 957–959, 103 S.Ct. at 2781–2783, 2787–2788. The *lawmaking process* must adhere in strict fashion to the "[e]xplicit and unambiguous provisions of the Constitution [which] prescribe and define the respective functions of Congress and of the Executive in the legislative process." *Id.,* 462 U.S. at 945, 103 S.Ct. at 2781.

**33.** *Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961). The plurality opinion in *Poe* holds that a justiciable controversy does not exist if "compliance with statutes is uncoerced by the risk of their enforcement." 367 U.S. at 508, 81 S.Ct. at 1758. There, the challenged Connecticut statute, which prohibited the giving of medical advice on the use of contraceptives, had been enacted in 1879, and, with but a single exception, no one had ever been prosecuted under its prohibition. The threat of prosecution was deemed "chimerical" because the state law had fallen into virtual *desuetudo* (disuse) through lack of prosecution for over 80 years. "Desuetudo annuls a norm, identical in character with a statute whose only function is to repeal a previously valid statute." Hans Kelsen, GENERAL THEORY OF LAW AND STATE 119 (1945) (reprinted 1961) (quoted in George C. Christie, JU- RISPRUDENCE (Text and Readings On The Philosophy of Law) 628 (1973)).

**34.** Today's opinion relies on several decisions in which initiative measures were held *facially unfit for application as law.* *Paisner v. Attorney General,* 390 Mass. 593, 458 N.E.2d 734 (1983); *State ex rel. Askew v. Meier,* 231 N.W.2d 821 (N.D. 1975); *Eu, supra* note 7; *Waltermire, supra* note 7; *State ex rel. Brant v. Beermann,* 217 Neb. 632, 350 N.W.2d 18 (1984); *Opinion of the Justices Relative to the Eighteenth Amendment,* 262 Mass. 603, 160 N.E. 439 (1928). The Nebraska and Massachusetts courts cited with approval the U.S. Supreme Court's definition of *law* in *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 356, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909): "Law is a statement of the circumstances in which *the public force will be brought to bear upon men through the courts."* (Emphasis mine.) *Beermann, supra* at 22; *Opinion of the Justices, supra* at 440.

**35.** "The law-creating process includes not only the process of legislation [all forms of lawmaking], but also the procedure of the judicial and administrative authorities. Even judgments of the courts very often contain legally irrelevant elements. If by the term 'law' is meant something pertaining to a. certain legal order, then *law is anything which has been created according to the procedure prescribed by the constitution fundamental to this order.* This does not mean, however, that everything which has been created according to this procedure is law in the sense of a legal norm. *It is a legal norm only if it purports to regulate human behavior, and if it regulates human behavior by providing an act of coercion as sanction."* (Emphasis added.) *Hans Kelsen, supra* note 33 at 123 (quoted in *Christie, supra* note 33 at 631). *See Christie, supra* note 33 at 638, where he refers to H.L.A. Hart's THE CONCEPT OF LAW. Professor Hart, one of the most respected contemporary English jurisprudential thinkers, acknowledges that he owes much to the work of Hans Kelsen.
See comments by other legal philosophers and jurisprudential thinkers who consider *enforceability* (whether actual or perceived) a *critical attribute of law:* (1) "[Law is a] body of rules prescribing external conduct and considered *justiciable." Kantorowicz, supra,* note 16 at 21–22

contest, I must conclude, is not within the parameters of a true initiative. It does not *propose a state law;* rather, it calls for a plebiscite to elicit popular preference for the proponents' federal-law objective, which, if approved, will exist solely *dehors* the coercive framework of the law.

## IV

## THREE IMPEDIMENTS PREVENT THE PROPOSED MEASURE FROM EVER BECOMING LAW

The measure in contest—which presses for congressional action that would convoke a constitutional convention for the purpose of imposing congressional office term limits—cannot become part of the State's law because (a) it is facially unfit for *incorporation into the corpus of her constitution* as enforceable state law, (b) it is incapable of being *implemented by state legislation* that would be binding on individual state lawmakers and (c) this court would be powerless to clothe the measure with binding force by crafting vitalizing jurisprudence.

The Art. 5 provisions of this State's fundamental law are not self-executing.[36] They require legislative implementation.[37] The legislature cannot enlarge the people's reserved power; it can only vitalize it by acts that will *"take effect* and *be in force."* [38] The breath of the power reserved by the initiative is to be drawn by tracking the language of the state constitution.[39]

If the proposed measure were adopted, it could *not become law* as part of the State's constitution. It is neither intended to be state law nor does its text appear to demonstrate the properties that would make it self-executing and facially capable of being carried into effect. The measure's declaration of public policy could never be comprised within the framework of any viable state legislation.

The process of changing by initiative petition either the State's statutory law or her constitution is a form of lawmaking. Any change in this State's constitution, to be effected by the initiative process, must hence qualify as law. The proposed measure would allow to be incorporated into this State's constitution a provision which, if adopted, would be neither *justiciable* nor *enforceable* directly or through the command of this State's constitutional jurisprudence.

State constitutional case law, like federal fundamental-law jurisprudence,[40] is a process akin to lawmaking. It may take effect either *retrospectively* or *prospectively*—very much like legislative enactments. This court would be *powerless* either (a) to give *this initiative* the force of law by crafting constitutional jurisprudence that could make the measure's terms binding on any of this State's officialdom or (b) to require the legislature to obey the policy that is sought to be adopted. If approved, this initiative could have *no effect as law in any form.*[41] In short, the measure in contest *usurps* for the people power that

(who is careful to note that (a) this definition of law is not the only possible one and (b) a norm is considered "justiciable" if it is invocable for application as law. *Kantorowicz, supra,* note 16 at 21) and (2) "[Legal rules] ... provide facilities more or less elaborate for individuals to create structures of rights and duties for the conduct of life *within the coercive framework of the law."* H.L.A. Hart, *Positivism and the Separation of Law and Morals,* 71 HARVARD LAW REVIEW 593 (1958) (emphasis added).

**36.** *See* the terms of Art. 5, § 3, *supra* note 19, which direct the legislature to implement the provisions of this article.

**37.** For the implementing provisions of Art. 5, §§ 1–3, *supra* note 19, see 34 O.S.1991 §§ 1 et seq.

**38.** *See* Art. 5, § 3, *supra* note 19 (emphasis added).

**39.** The Oklahoma Constitution, to which all statutes must yield, is to be so construed as to give effect to the intent of its framers and of the people adopting it. *Hendrick v. Walters,* Okl., 865 P.2d 1232, 1238 (1993); *Draper v. State,* Okl., 621 P.2d 1142, 1145 (1980).

**40.** *See, e.g., Linkletter v. Walker,* 381 U.S. 618, 624–625, 85 S.Ct. 1731, 1734, 1735, 14 L.Ed.2d 601 (1965).

**41.** For *enforceability* as a critical attribute of law, see *Paisner, supra* note 34; *Beermann, supra* note 34; *Meier, supra* note 34; *Eu, supra* note 7; *Waltermire, supra* note 7.

is broader than that which stands reserved to them by the state's constitution.

## V

### THE TEACHINGS OF *THREADGILL*

My commitment to the *undiluted force of Threadgill v. Cross*[42] *continues with undiminished fervor.*[43] *Threadgill* teaches that conformity of an initiative measure's *content* to the commands of our constitution—state or federal—may not be judicially examined *in advance of the initiative petition's adoption by the people. Threadgill* protects from pre-submission, content-based constitutional challenges those measures which, if adopted by the people, *would become law* —not measures which are *facially* incapable of attaining the status of law.

Pre-submission review of an initiative's fundamental-law conformity *should be confined to fatally vitiating infirmities in the initiative process itself* —to measures that are procedurally flawed, patently invalid or, as in this case, are facially incapable of becoming law. The electorate's effort at legislating *directly must not* be hindered by pre-election attacks *other* than those which target the petition's compliance with some *insuperable barrier to the measure's submission.*

Since *the proposed measure is clearly and facially contrary to state law,*[44] *Threadgill* is no obstacle to this court's pre-submission scrutiny of the initiative's validity and to a pre-submission sentence of nullity.

## VI

### THE PROPOSED MEASURE DIFFERS FROM THAT IN INITIATIVE PETITION NO. 349

This proposed measure is distinguishable from that in *In re Initiative Petition No. 349.*[45] The latter initiative—which would have prohibited abortions except in four instances and imposed *criminal penalties* for the proposed law's violation—*was held not to qualify for submission* to a vote of the electorate.[46] I was in dissent there.[47]

Only in the clearest case of *firmly settled* and *stable* federal or state constitutional jurisprudence that *absolutely* condemns the proposed measure as facially impossible of enforcement, application or execution—and then *only* if the protestants have standing to complain of constitutional infirmity—is this court ever justified in not clearing an initiative petition for submission. It is for this reason that I receded from the court's pronouncement in *Initiative No. 349. The anti-abortion measure there under scrutiny was, in my view, not facially fraught with a fundamental-law infirmity.* It was clearly entitled to at least a presumption of correctness. Had it been tainted by a fatal facial constitutional flaw, I would have acceded to the court's resolve to withhold it from submission.

### SUMMARY

I concur in not allowing *any portion of the proposed measure* to survive the axe of to-

**42.** 26 Okl. 403, 109 P. 558 (1910).

**43.** My unswerving commitment to *Threadgill, supra* note 42, is documented in several reported decisions. *See In re Initiative Petition No. 362*, Okl., 899 P.2d 1145, 1153 (1995) (Opala, J., concurring in result); *In re Initiative Petition No. 360*, Okl., 879 P.2d 810, 821 (1994) (Opala, J., concurring in result); *In re Initiative Petition No. 358*, Okl., 870 P.2d 782, 788 (1994) (Opala, J., concurring in result); *In re Initiative Petition No. 349*, Okl., 838 P.2d 1, 18 (1992) (Opala, C.J., dissenting); *In re Initiative Petition No. 358, supra* note 13 at 781 (Opala, C.J., concurring in result); *In re Initiative Petition No. 347*, Okl., 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *In re Initiative Petition No. 341*, Okl., 796 P.2d 267, 275 (1990) (Opala, V.C.J., concurring in result); *In re Initiative Petition No. 317*, Okl., 648 P.2d 1207, 1222 (1982) (Opala, J., concurring in the judgment); *In re Initiative Petition No. 315*,

Okl., 649 P.2d 545, 554–555 (1982) (Opala, J., concurring in result); *see also In re Initiative Petition No. 349* (No. 76,437, Feb. 20, 1991) (Opala, C.J., concurring in part and dissenting in part) (unpublished opinion).

**44.** For the "clearly-contrary-to-law" test for limiting pre-election challenges, see *Plugge v. McCuen*, 310 Ark. 654, 841 S.W.2d 139, 142 (1992); *Hodges v. Dawdy*, 104 Ark. 583, 149 S.W. 656, 659 (1912).

**45.** *In re Initiative Petition No. 349, supra* note 43.

**46.** *Planned Parenthood v. Casey*, 505 U.S. 833, 845, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992).

**47.** *In re Initiative Petition No. 349, supra* note 43 at 18 (Opala, C.J., dissenting).

day's invalidation. Its entire text falls *dehors* the parameters of a constitutionally authorized initiative. Its terms neither propose a state law nor are capable of becoming state law. The use of the initiative as a vehicle for invoking a plebiscite would make our state government vulnerable to congressional condemnation as unrepublican in form.

The State's constitutional initiative is not to be treated as a license for *any* public opinion poll. Judicial clearance for submission of a measure must be restricted to *proposals for the state law's change or, in case of a referendum, for the state law's rejection.* If a measure is not intended to be state law or is clearly and facially contrary to law, its submission offends Art. 5, § 1, Okl. Const.

That portion of the measure—which proposes to amend the State's constitution by adding to its text a "statement of public policy" on congressional office term limits—can never be translated into viable law of this State. The initiative in contest clearly offends Oklahoma's initiative regime and impermissibly invades and undermines the independence of the State Legislature's deliberative decision-making process. The plebiscite that is desired for the expression of popular preference lies *dehors the permissible parameters of this State's initiative process.* An election whose result can bring no concrete impact on the *state government's constitutional order or on the body of her law* is an exercise in futility and a fraud upon the people.

SUMMERS, Justice, concurring in part and dissenting in part.

I join Justice Hodges' dissenting opinion insofar as he would sever the unconstitutional part of the proposal and submit the remainder to a vote.

I concur in the majority's conclusion that the attorney may not withdraw the signatures to the initiative petition.

ALMA WILSON, Chief Justice, dissenting.

I would allow the initiative petition to be submitted to a vote of the people.

HODGES, Justice, dissenting.

I agree that the initiative measure as submitted violates the Oklahoma and United States Constitutions. This Court, however, has failed to give effect to the severability provision of the measure which allows the valid portions to continue in full force and effect. Once the offending portions are severed, the question of whether the remainder is to enjoy a vote of the people is no longer a constitutional question and the people have a right to enact it or reject it at the polls.

We live at a time when people have become increasingly skeptical concerning their government. The term limits battle is but one example of the electorate's desire to exercise more direct control over government. At such a time, the constitutional initiative is one device which helps maintain a balance between representative government and pure democracy. It is an avenue of communication between government and the people, to whom government must respond.

During an earlier era of popular distrust, the framers of the Oklahoma Constitution established that "[t]he first power reserved by the people is the initiative." Okla. Const. art. 5, § 2. "The right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter." *Oliver v. City of Tulsa,* 654 P.2d 607, 613 (Okla.1982) (quoting *McFadden v. Jordan,* 32 Cal.2d 330, 196 P.2d 787, 788 (1948)). Article 5, Section 1, of the Oklahoma Constitution states that "the people reserve to themselves the power to propose laws *and amendments* to the Constitution and to enact or reject the same at the polls independent of the Legislature." (emphasis added).

This Court's construction of Article 5, Section 1, establishes a requirement which was not expressed by the framers of the Oklahoma Constitution. Nothing in the Oklahoma Constitution states that the people's power is limited to enacting only "laws". The people have also reserved the power to enact amendments to the Oklahoma Constitution through the initiative process. In fact, while twenty-six states have a method of enacting legislation by popular vote, only seventeen states recognize the constitutional ini-

tiative. *See* Dennis W. Arrow, Representative Government and Popular District: *The Obstruction/Facilitation Conundrum Regarding State Constitutional Amendment by Initiative Petition,* 17 Okla.City U.L.Rev. 5, 8 (1992). Oklahoma is one of those seventeen states.

The fact that Proponents have failed to present an initiative measure which fully complies with constitutional requirements does not require that the initiative process be withheld from advocates of term limits. When unconstitutional provisions in an initiative measure may be stricken without impairing the measure's effect, the remaining portions are valid. *In re Initiative No. 191,* 201 Okla. 459, 207 P.2d 266, 270 (1949). A severability provision creates a presumption that the valid remaining portions would have been enacted without the omitted unconstitutional portions. *Englebrecht v. Day,* 201 Okla. 585, 208 P.2d 538, 544 (1949). The section 6 severability provision of this initiative measure is the mechanism by which a constitutionally permissible proposed expression of the will of the people should be placed on the ballot. It provides:

> The provisions of this Amendment are severable, and if any part or provision of this Amendment shall be void, invalid, or unconstitutional, the decision of the court so holding shall not affect or impair any of the remaining parts or provisions of this Amendment, and the remaining provisions of this Amendment shall continue in full force and effect.

After severing the offending portions of the initiative measure and amending the ballot title to accommodate the remaining provisions, State Question 673 would provide:

SHALL THE FOLLOWING PROPOSED AMENDMENT TO THE CONSTITUTION BE APPROVED?

( ) YES—FOR THE AMENDMENT

( ) NO—AGAINST THE AMENDMENT

BE IT ADOPTED BY THE PEOPLE OF THE STATE OF OKLAHOMA

OKLAHOMA CONGRESSIONAL TERM LIMITS AMENDMENT

AN AMENDMENT TO THE OKLAHOMA CONSTITUTION STATING THE FINDINGS AND DECLARATIONS OF THE PEOPLE AND STATING THE PUBLIC POLICY OF OKLAHOMA RELATING TO TERM LIMITS FOR MEMBERS OF THE UNITED STATES CONGRESS.

The People of Oklahoma find and declare that:

Whereas, the People of our State voted by over sixty-six percent to limit the terms of U.S. Representatives to three terms and limit U.S. Senators to two terms, and

Whereas, the U.S. Supreme Court has ruled that an amendment to the U.S. Constitution is necessary to limit terms of members of Congress, and

Whereas, there are two methods to propose amendments to the U.S. Constitution that must then be ratified by three-fourths of the States, or thirty-eight. These methods are (1) for two-thirds of both houses of the United States Congress to so vote, or (2) for thirty-four States to apply for an Article V convention to so vote, and

Whereas, the Congress has refused to propose such an amendment, and by a clear majority, defeated the same term limits passed by over sixty-six percent of the Voters of our State in 1994, and

Whereas, the Congress has a clear conflict of interest in proposing term limits on its own members.

Therefore, We, the People of Oklahoma, hereby amend our state constitution pursuant to our power under that constitution. Section 2—Public Policy of Oklahoma Regarding Federal Term Limits.

It is hereby declared to be the Public Policy of the State of Oklahoma that the terms of office of Members of the United States Congress should be limited to three terms for members of the House of Representatives and two terms for Members of the Senate, and the United States Constitution should be amended to so provide.

If enacted, the resulting constitutional amendment would express the public policy of Oklahoma regarding term limits for its members of Congress. With the unconstitutional directive removed from the measure, each legislator would remain free to express

**208**

his or her own deliberative vote in representing his or her own district.

The amended measure would be consistent with the nonbinding referendum measure approved in *Kimble v. Swackhamer*, 439 U.S. 1385, 99 S.Ct. 51, 58 L.Ed.2d 225 (1978). There, Chief Justice Rehnquist determined that citizen participation in a nonbinding referendum as to whether the Nevada Legislature should ratify the Equal Rights Amendment did not violate Article V of the United States Constitution. He noted that he would be "most disinclined" to rule out "communication between members of the legislature and their constituents." *Id.* at 1387–88, 99 S.Ct. at 54. Apparently, this Court does not share Chief Justice Rehnquist's judicial restraint. Under today's holding, no advisory amendment to the Oklahoma Constitution could be enacted directly by the people through the initiative process. This Court should facilitate the use of the initiative process by applying the severability provision of the proposed measure and placing the constitutional portions of the measure on the ballot.

HARGRAVE, Justice, dissenting.

I respectfully dissent from the majority opinion in this case. A plain reading of Article 5, Section 1, of the Oklahoma Constitution reserves to the people the right to propose an amendment to the Constitution and to vote on the adoption or rejection of the same. I find no impediment to the people amending the Constitution for the purpose of making a statement therein. Neither do I find the proposal so facially infirm as to strike it, at this time, from a submission to the people. I would treat this proposal as any other proposed act of legislation and, if and when it is adopted, at that time determine its constitutionality in the presentment of a proper case. I would let the people complete their attempt to use the reserved right of the initiative process.

I AM AUTHORIZED TO STATE THAT CHIEF JUSTICE WILSON CONCURS IN THIS VIEW.